UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY MORABITO,<br><br>*Plaintiff*,<br><br>v.<br><br>WESTCHESTER COUNTY, et al.,<br><br>*Defendants*. | Case No. 22-CV-6853 (KMK)<br><br>ORDER & OPINION |

Appearances:

Christina Seideman, Esq.
Cravath, Swaine & Moore LLP
New York, NY
*Counsel for Plaintiff*

Loren Zeitler, Esq.
Westchester County Department of Law
White Plains, NY
*Counsel for Defendants Westchester County, Sergeant Price, George Latimer, and Joseph Spano*

David M. Fulvio, Esq.
Paul Andrew Sanders, Esq.
Barclay Damon LLP
Rochester, NY
*Counsel for Defendants Wellpath LLC, Edith Onua, Sara George, Zoeth Stone-Edwards, Eric Paolilli, Raul Ulloa, and Michael Kunz*

KENNETH M. KARAS, United States District Judge:

Jeffrey Morabito ("Plaintiff") brings this Action against Westchester County (the "County"); George Latimer ("Latimer"); Joseph Spano ("Spano"); Sergeant Price ("Price," and together with the County, Latimer, and Spano, the "County Defendants"); Wellpath LLC ("Wellpath"); Raul Ulloa ("Ulloa"); Michael Kunz ("Kunz"); Eric Paolilli ("Paolilli"); Sara George ("George"); Edith Onua ("Onua"); and Zoeth Stone-Edwards ("Stone-Edwards," and together with Wellpath, Ulloa, Kunz, Paolilli, George, and Onua, the "Wellpath Defendants")

(collectively, "Defendants"), seeking compensatory damages pursuant to 42 U.S.C. § 1983 for asserted violations of his Fourteenth Amendment rights as well as pursuant to Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134, and § 504 of the Rehabilitation Act of 1973. (Second Am. Compl. ("SAC") ¶¶ 2–4 (Dkt. No. 67).) Before the Court are Motions by the County Defendants and the Wellpath Defendants seeking to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. (*See* Mot. to Dismiss ("Wellpath Mot.") (Dkt. No. 109); Mot. to Dismiss ("County Mot.") (Dkt. No. 110).) For the reasons that follow, the Wellpath Defendants' Motion to Dismiss is denied, while the County Defendants' Motion to Dismiss is granted in part and denied in part.

## I. Background

### A. Factual Background

#### 1. Opioid Use Disorder and Treatment

At all times relevant to this Action, Plaintiff was held in custody in the Westchester County Jail in Valhalla, New York. (SAC ¶ 7.) Plaintiff experiences "severe" Opioid Use Disorder, a chronic condition experienced by some people who have used opioids. (*Id.* ¶¶ 20, 57.) *See also Opioid Use Disorder*, Cleveland Clinic (July 22, 2025), https://my.clevelandclinic.org/health/diseases/24257-opioid-use-disorder-oud [https://perma.cc/6FFJ-YJG7].[1] Opioids "are addictive substances" that "cause [a person's] body

---

[1] The Court may take judicial notice of medical information outlining the diagnostic criteria for and symptoms concomitant with Opioid Use Disorder. *See* Fed. R. Civ. P. 201(b) (explaining that a court may take judicial notice of a "fact that is not subject to reasonable dispute because it[] . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *United States v. Mirabal*, No. 16-CR-272, 2023 WL 2401377, at *8 n.5 (S.D.N.Y. Mar. 8, 2023) ("Courts in this District regularly take judicial notice

to produce more dopamine," a neurotransmitter that provides "the sensation of pleasure" and, for some people, euphoria. *See Opioid Use Disorder*, Cleveland Clinic. Individuals who experience Opioid Use Disorder can experience "a strong desire to continue using opioids to maintain" these positive feelings, as well as "physical dependence" on the drug, such that ceasing to use leads to "a fever and chills, nausea and vomiting[,] and intense cravings for opioids." *Id.* (*See also* SAC ¶ 37 (describing "bone and joint aches, nausea, vomiting, diarrhea, fever, excessive sweating, hypothermia, hypertension, tachycardia, depression, anxiety, dysphoria, and insomnia" and concomitant life-threatening complications, such as "pneumonia and fatal dehydration").) Those experiencing Opioid Use Disorder often continue to use the drugs regardless of the collateral consequences on their obligations, relationships, and mental or physical health. *See Opioid Use Disorder*, Cleveland Clinic. (*See also* SAC ¶ 20 (describing "uncontrollable cravings for and use of opioids" resulting from Opioid Use Disorder, "no matter the consequences").)

Without treatment, "patients with opioid use disorder are frequently unable to control their use of opioids." (SAC ¶ 24.) Treatment often takes the form of Medication Assisted Treatment ("MAT"), (*id.* ¶ 29), using medications for opioid use disorder ("MOUD"), such as methadone, buprenorphine, naltrexone, *see Opioid Use Disorder*, Cleveland Clinic, and/or suboxone, (SAC ¶ 30), as well as counseling, (*id.*). Plaintiff alleges that MAT treatment is "dramatically superior to other treatment options, with studies showing improved retention in treatment, abstinence from illicit drugs, and decreased mortality." (*Id.* ¶ 31.) Many jails and prisons offer MAT treatment. (*Id.* ¶ 43.) If MAT treatment is interrupted, a patient will experience "[f]orced withdrawal" from the treating drugs, which disrupts their treatment plan

of facts from reputable medical sources."); *United States v. Williams-Bethea*, 464 F. Supp. 3d 562, 567 (2020) (assessing medical studies).

and dramatically reduces the odds they will continue treatment. (*Id.* ¶ 41 (describing "seven-fold" increase in treatment desistence rate).) It also increases the patient's likelihood of death. (*Id.* (describing 200% increase in mortality rate).)

2. Westchester County and Wellpath Policies

Plaintiff alleges that the County and Wellpath "have a blanket policy of denying MAT to non-pregnant pre-trial inmates in the custody of the [Westchester County Department of Corrections] [(']WCDOC[')]." (SAC ¶ 46.) Wellpath is a limited liability company contracted by the County to provide comprehensive medical and mental health services for all individuals in the custody of the WCDOC facility located in Valhalla, New York. (*Id.* ¶ 12.) Wellpath operates pursuant to the terms of a 2019 agreement (the "2019 Agreement") for the provision of comprehensive health care services for all individuals in the custody of WCDOC. (*Id.* ¶ 47.) The 2019 Agreement was the result of a request for proposals issued by Defendant Spano on behalf of the County, which required Wellpath to submit "a plan to handle inmates requiring detoxification for alcohol or drug abuse" and further specified that "Methadone maintenance will not be permitted beyond the detoxification period, except for confirmed pregnant inmates who will be maintained on methadone during the pregnancy, ([Wellpath] is expected to undertake best efforts to arrange for such maintenance services to be provided on-site)." (*Id.* ¶¶ 47–48.) Defendants Latimer and Spano were "directly involved in setting the scope and the terms of the 2019 Agreement." (*Id.* ¶ 51.)

Additionally, Plaintiff alleges that the "blanket denial of MAT, whether on- or off-site, to non[-]pregnant inmates with OUD detained by WCDOC is a practice that is so well-settled and consistently followed that it has the force of the law." (*Id.* ¶ 53.)

3. Plaintiff's Experiences in WCDOC Custody

Plaintiff was incarcerated in WCDOC from February 8, 2020, to March 25, 2020; from July 2, 2021, to July 12, 2021; from September 29, 2021, to October 8, 2021; and from December 8, 2021, to January 12, 2022. (*Id.* ¶ 54.) Plaintiff was denied access to MAT during each of these periods and was never drug tested. (*Id.* ¶¶ 54–55.)

In 2021, Plaintiff began a methadone maintenance program at St. Joseph Medical Center. (*Id.* ¶ 58.) Around the beginning of 2022, Plaintiff discontinued the methadone maintenance program and started treatment with suboxone pursuant to a prescription from his general practitioner. (*Id.* ¶ 59.) On or around June 30, 2022, Plaintiff was placed in pre-trial detention at the facility. (*Id.* ¶¶ 54, 60.)

The day of his arrival at WCDOC, Plaintiff exhibited "severe withdrawal symptoms." (*Id.* ¶ 61.) He could not readily walk or stand, and he was "experienc[ing] excruciating pain all over his body" with an inability to eat or drink. (*Id.*) He also was regularly vomiting with a frequency that led to dehydration and suffered from hot and cold sweats, nausea, shakes, anxiety, stomach pain, diarrhea, severe lethargy, and blurred vision. (*Id.*) He had visible track marks on his arm from using opioids intravenously. (*Id.*) That day, he "immediately informed WCDOC officers and Wellpath medical staff of his symptoms," but he was left in a holding cell, in a puddle of his own vomit, despite calling out that he needed to be seen for medical treatment. (*Id.* ¶¶ 62–63.)

After Plaintiff had been in the holding cell for several hours, an officer named Officer Smith took Plaintiff to be seen by Wellpath medical staff. (*Id.* ¶ 64.) Plaintiff informed the Wellpath staff of his symptoms and that they had been untreated. (*Id.*) Officer Smith "advised Plaintiff that he had mistakenly taken him from his cell instead of another inmate and took him

to return to his cell without receiving any treatment." (*Id.*) Over Plaintiff's protests, he was returned to the cell. (*Id.* ¶ 65.)[2]

While walking back to the cell, Plaintiff was lethargic and could not move well. (*Id.* ¶ 66.) He "almost fell," apparently stumbling. (*Id.*) In response, Officer Smith grabbed Plaintiff's shirt. (*Id.*) Officer Smith asked Plaintiff "if he was resisting," to which Plaintiff responded that he could barely stand or walk. (*Id.*) Officer Smith forced Plaintiff along "faster than he was able" to move, which was painful. (*Id.*) Defendant Price told Officer Smith "to write up a disciplinary report against Plaintiff, though Officer Smith refused." (*Id.* ¶ 67 (alleging that Price said "write him up, this isn't the Ramada, you don't pick your medication here").) Defendant Price therefore "wrote up a disciplinary report in retaliation for Plaintiff's requests for medical attention," which "was later dismissed." (*Id.* ¶ 68.)

Plaintiff "did not have another opportunity to speak with medical staff until his turn came up in the booking process, approximately six hours after his arrival at" the Valhalla facility. (*Id.* ¶ 69.) At that point, Plaintiff advised Defendant Onua that he had Opioid Use Disorder and was experiencing withdrawal symptoms. (*Id.* ¶ 70.) He "specifically requested methadone or suboxone treatment," apprising Onua of the last time he had used the drugs and of the MOUD he had been prescribed. (*Id.*) Onua could see track marks on Plaintiff's arms, and recorded his blood pressure and pulse as elevated, which is consistent with opioid withdrawal. (*Id.* ¶ 71.)

Onua advised Plaintiff that WCDOC did not offer methadone or suboxone for Opioid Use Disorder, meaning that Plaintiff would have to confront his withdrawal symptoms "cold

---

[2] The Court notes that Plaintiff has alleged that he was placed in a "holding cell," then brought to medical from "his cell" and returned to "his cell." (SAC ¶¶ 64–66.) The allegations are otherwise consistent with the cell from which he was picked up and returned to being a booking cell, rather than a cell to which he was assigned after booking had been completed.

turkey." (*Id.* ¶ 72.) Plaintiff was prescribed only Tylenol for his Opioid Use Disorder, as well as a medication to treat alcohol withdrawal. (*Id.*)

Plaintiff apparently took these medications, but he alleges they "did nothing for" his Opioid Use Disorder symptoms. (*Id.* ¶ 73.) His symptoms persisted and intensified over the following days. (*Id.*) Plaintiff was not able to sleep and he also involuntarily evacuated his bowels twice, necessitating a change of clothes. (*Id.*) During these days, Plaintiff sometimes was "physically unable to take his medication" due to tremors, which prevented him from holding a cup of water to take the pills without spilling it. (*Id.* ¶ 74.) Wellpath medical staff came into his cell to medicate him. (*Id.*) For over a week, he was too weak to move into the shower. (*Id.* ¶ 75.) His vomit also accumulated on the floor of his cell. (*Id.*)

Plaintiff consistently requested medical attention, apprising medical staff of the severity of his symptoms and requesting methadone or suboxone, including on July 1, 2022, to Defendant George; July 2, 2022, to Defendant Paolilli; July 5, 2022, to Defendant Stone-Edwards; July 7, 2022, to Defendant Ulloa; July 9, 2022, to Defendant Paolilli; and July 19, 2022, again to Defendant Ulloa.[3] (*Id.* ¶¶ 76–80.) Each time, he was told that WCDOC does not offer this treatment and that he would not receive it. (*Id.*) Plaintiff alleges that Defendant Ulloa was the senior Wellpath official involved in his care and oversaw treatment provided by Wellpath medical staff. (*Id.* ¶ 85.)

After five days, Plaintiff requested to see a psychiatrist. (SAC ¶ 81.) He saw Defendant Kunz on July 8, 2022. (*Id.*) Plaintiff advised Kunz of his symptoms and MOUD prescriptions.

[3] There appears to be a typo in paragraph 80 of the SAC, where there is a reference to Defendant Edwards while describing a meeting with Defendant Ulloa. (*See* SAC ¶ 80.) The Court assumes that this reference should be to Defendant Ulloa. (*Id.*)

(*Id.*) Kunz refused to prescribe methadone or suboxone; he prescribed only medication for insomnia. (*Id.*)

A number of Plaintiff's symptoms persisted for a month, including the body pains, lethargy, hot and cold sweats, insomnia, blurred vision, and abnormally high vitals. (*Id.* ¶ 84.) As a direct result of the above-described incidents, Plaintiff sought therapy to treat depression and recurrent nightmares. (*Id.* ¶ 86.)[4]

B. Procedural Background

On August 11, 2022, Plaintiff commenced the instant Action. (Compl. (Dkt. No. 2).) As relevant here, Plaintiff filed the operative SAC on March 20, 2024. (*See* SAC.) On November 20, 2024, Wellpath filed a suggestion of bankruptcy. (*See* Suggestion of Bankruptcy (Dkt. No. 101).) It updated the Court on August 12, 2025, that the bankruptcy proceedings had concluded. (Letter from Paul A. Sanders, Esq. to Court (Aug. 13, 2025) (Dkt. No. 108).)

[4] In their filings, both the Wellpath Defendants and the County Defendants repeatedly cite and rely on allegations in Plaintiff's earlier filings, from when he was proceeding pro se. (*See* Wellpath Mot., Ex. Mem. of Law ("Wellpath Mem.") (Dkt. No. 109-4); Mem. of Law in Supp. re: Mot. to Dismiss ("County Mem.") (Dkt. No. 114).) "It is well-established that 'an amended complaint ordinarily supersedes the [previous complaint], and renders it of no legal effect.'" *Fenner v. News Corp.*, No. 09-cv-9832, 2011 WL 13359351, at *2 (S.D.N.Y. Apr. 26, 2011) (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977), *cert. denied*, 434 U.S. 1014 (1978)). Although "some courts will consider facts from the plaintiff's previous complaint that have not been repeated in the amended complaint" "[w]hen the plaintiff is pro se," *Sanderson v. Leg Apparel LLC*, No. 19-CV-8423, 2020 WL 7342742, at *2 n.1 (S.D.N.Y. Dec. 14, 2020) (alterations adopted, emphasis and quotation marks omitted), Defendants have pointed to no authority for the proposition that, once a plaintiff becomes counseled, that plaintiff should still fall within the scope of this rule. Further, Plaintiff's earlier pleadings were not the model of clarity, and crediting those unclear allegations to dismiss Plaintiff's SAC prior to discovery seems particularly inconsistent with the objectives of this rule, which is to promote fairness to a party proceeding pro se. Accordingly, the Court declines to rely on allegations contained solely in Plaintiff's Complaint or Amended Complaint, but instead credits the allegations in the SAC for the purpose of resolving the instant Motions.

On August 13, 2025, the Court set a briefing schedule on anticipated Motions to Dismiss by the Defendants. (*See* Mem. Endorsement dated Aug. 13, 2025 (Dkt. No. 108).) On September 12, 2025, Defendants filed their Motions and supporting Memoranda. (*See* Wellpath Mot.; County Mot.; Wellpath Mem.; County Mem.) On October 8, 2025, *pro bono* counsel appeared on behalf of Plaintiff to address any issues related to the bankruptcy stay as well as to address the pending Motions. (*See* Notice of Limited Appearance of Pro Bono Counsel (Dkt. No. 115); Notice of Limited Appearance of Pro Bono Counsel (Dkt. No. 116).) On November 12, 2025, Plaintiff filed his Memorandum of Law in Opposition. (*See* Mem. of Law in Opp'n re: Mot. to Dismiss ("Pl.'s Opp'n") (Dkt. No. 119).) On December 19, 2025, Defendants filed their reply memoranda. (Reply Mem. of L. in Supp. re: Mot. to Dismiss ("Wellpath Reply") (Dkt. No. 122); Reply Mem. of L. in Supp. re: Mot. to Dismiss ("County Reply") (Dkt. No. 123).)

## II. Discussion

### A. Standard of Review

The Supreme Court has held that while a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted) (internal quotation marks and citation omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration adopted) (internal quotation marks and citation omitted). Instead, a complaint's "[f]actual

allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570. However, if a plaintiff has not "nudged [his] claim[ ] across the line from conceivable to plausible, the[ ] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" (alteration adopted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d

99, 107 (2d Cir. 1999) (internal quotation marks and citation omitted); *see also Markatos v. Citibank, N.A.*, 760 F. Supp. 3d 70, 79 (S.D.N.Y. 2024) (same).

B. Analysis

The SAC asserts claims for a violation of Plaintiff's Fourteenth Amendment rights against each individual Defendant, (SAC ¶¶ 87–89), as well as against the County and Wellpath, (SAC ¶¶ 90–92); and a violation of Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act of 1973 against the County, (SAC ¶¶ 93–101). Accordingly, the Court analyzes whether the facts alleged in the SAC support any of these claims.

1. Effect of Wellpath Bankruptcy

The Wellpath Defendants argue that Plaintiff is enjoined from pursuing his claims against them due to the issuance of a Plan and Confirmation Order in Wellpath's bankruptcy proceedings. (Wellpath Mem. 8.) Pursuant to the Plan and Confirmation Order, all claims and causes of action against Wellpath Holdings, Inc. (a parent holding company) and its affiliated debtors, including Defendant Wellpath, were discharged. (*Id.*) The Confirmation Order permanently enjoined holders of such claims and causes of action from, among other things, commencing or continuing any proceeding of any kind in connection with such claims or enforcing recovery from the debtors or their estates. (*Id.* at 8–9.) The Plan provided that the release also applied to a covered "Entity's . . . employees . . . acting in such capacity . . . ." (*Id.* at 10.) The deadline to opt out from this Order has expired. (*Id.* at 11.) A number of claims similar to Plaintiff's have been dismissed as they were discharged in bankruptcy pursuant to the Order. *See Rios v. Claps*, No. 24-CV-926, 2026 WL 2267767, at *3 n.4 (D. Colo. Aug. 6, 2026) (declining to address a claim that had been dismissed in the Wellpath bankruptcy proceeding); *Bradley v. Lazopoulos*, No. 23-CV-5019, 2026 WL 523921, at *1 (N.D. Ill. Feb. 25, 2026)

("Because Wellpath's bankruptcy proceeding discharged all of Bradley's claims against Wellpath and Dr. Lazopoulos, Stockman, and Dr. Zizic, the Court dismisses them with prejudice."); *Nicholson v. Voorstad*, No. 24-CV-1758, 2025 WL 3516473, at *3 (M.D. Pa. Dec. 8, 2025) ("These claims must be dismissed because they have been discharged in bankruptcy.").

In response, Plaintiff advances three arguments: (1) the claims are nondischargeable as they represent a "willful and malicious injury," (Pl.'s Opp'n 22–23); (2) the documents should not be considered on a Motion to Dismiss pursuant to Rule 12(b)(6), (*id.* at 23); and (3) if they are considered (and, Plaintiff argues, they can be considered only if Wellpath's Motion is converted to one for summary judgment), the argument should still be rejected on the basis that Plaintiff received no actual notice of the release of claims, (*id.* at 24–28). For the reasons that follow, the Court concludes that Plaintiff is not barred from pursuing the claims against the Wellpath Defendants by the Discharge Order.

a. Plaintiff's Proof of Claim

On January 8, 2026, Plaintiff moved in the Wellpath bankruptcy proceeding for Leave to File a Late Proof of Claim. (Letter from Christina Seideman, Esq. to Court (Feb. 4, 2026), Ex. A (Dkt. No. 124-1).) On February 2, 2026, the United States Bankruptcy Court for the Southern District of Texas granted Plaintiff's request on the basis that his lack of notice provided good cause for filing an untimely proof of claim. (Letter from Christina Seideman, Esq. to Court (Feb. 4, 2026), Ex. B (Dkt. No. 124-2).) On February 4, 2026, Plaintiff's counsel advised the Court as to this development. (Letter from Christina Seideman, Esq. to Court (Feb. 4, 2026) 1 (Dkt. No. 124).) Despite over seven months having elapsed since this filing, Defendants have not responded. (*See generally* Dkt.) The Court agrees that this holding by the Bankruptcy Court appears to "conclusively negate[]" the Wellpath Defendants' argument that Morabito's claims

against the Wellpath Defendants have been discharged.[5] (Letter from Christina Seideman, Esq. to Court (Feb. 4, 2026) at 1.) Out of fairness to the Defendants, however, the Court has considered whether other elements of the Wellpath Bankruptcy Order likewise foreclose Defendants' arguments and concludes that they do.

b. "Willful and Malicious Injury"

The Bankruptcy Code exempts from discharge debts arising from "willful and malicious injury by the debtor to another entity or property of another entity . . . ." 11 U.S.C. § 523(a)(6). "A willful and malicious injury requires proof of 'deliberate or intentional injury' rather than a merely deliberate or intentional act that happens to lead to an injury." *In re Lee*, No. 22-70367, 2024 WL 1261790, at *11 (Bankr. E.D.N.Y. Mar. 25, 2024) (quoting *Kawaauhau v. Geiger*, 523

[5] Somewhat ironically, given that Plaintiff has filed materials from the bankruptcy proceeding for this Court's consideration, Plaintiff argues that the Court cannot consider the materials filed in the bankruptcy proceeding presented by Defendants. (Pl.'s Opp'n 22–23, 24–25). This is incorrect. "[T]he Court's consideration of documents attached to, or incorporated by reference in the Complaint, and matters of which judicial notice may be taken," is proper without "convert[ing] the motion to dismiss into one for summary judgment." *Watson v. New York*, No. 22-CV-9613, 2023 WL 6200979, at *1 (S.D.N.Y. Sept. 22, 2023) (quoting *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002)). The Court may take judicial notice of materials filed in other actions "to establish the fact of the litigation." *Estrada Vega v. Gateway Bank F.S.B.*, No. 24-CV-8000, 2025 WL 4664798, at *6 (E.D.N.Y. Dec. 31, 2025), *report and recommendation adopted*, 2026 WL 873016 (E.D.N.Y. Mar. 31, 2026). Pursuant to this principle, courts regularly take notice of bankruptcy proceedings. *Id.* (collecting cases). And specifically, the Court "may take judicial notice of, and therefore consider on a motion to dismiss, the Settlement Agreement and other documents filed in [a party's] bankruptcy case and referenced by the parties" without converting a Motion to Dismiss pursuant to Rule 12(b)(6) to a Motion for Summary Judgment. *Amazon.com Servs. LLC v. Digital Direct & More, Inc.*, No. 24-CV-7617, 2025 WL 1456501, at *4 n.7 (E.D.N.Y. May 21, 2025); *see also Stephen v. Thrifty, LLC*, No. 22-CV-3855, 2025 WL 2772940, at *2 n.2 (E.D.N.Y. Sept. 26, 2025) ("This Court may take judicial notice of the court filings in Defendants' bankruptcy proceeding."); *In re Pellechia*, 617 B.R. 750, 752 (Bankr. D. Conn. 2020) (substantially same). Accordingly, the Court rejects Plaintiff's argument that it cannot consider the materials from the Wellpath bankruptcy on a Motion to Dismiss pursuant to Rule 12(b)(6) without converting the Motion to one for summary judgment.

U.S. 57, 61 (1998)), *appeal denied sub nom. In re Lee*, No. 24-CV-2862, 2025 WL 857810 (E.D.N.Y. Mar. 19, 2025). "As for the malice element, in cases where a debtor seeks profit or some other benefit, the underlying conduct, however deplorable, would not give rise to liability under § 523(a)(6) in the absence of some additional, aggravating conduct on the part of the debtor of sufficient gravity to warrant an inference of actual malice under the Second Circuit decision in *Navistar v. Stelluti (In re Stelluti)*, 94 F.3d 84 (2d Cir. 1996)." *Id.* (quotation marks omitted and alterations adopted).

The Wellpath Defendants do not address Plaintiff's argument that the allegations constitute a "willful and malicious" injury such that the claims could not have been discharged in bankruptcy. (*See generally* Wellpath Reply.) Accordingly, the Wellpath Defendants have forfeited any opposition to this argument. *See Rubenstein v. Cosmos Holdings, Inc.*, No. 19-CV-6976, 2020 WL 3893347, at *11 (S.D.N.Y. July 10, 2020) ("[The] [d]efendants failed to address [the] [p]laintiff's argument in their reply papers . . . . The [c]ourt declines to make [the] [d]efendants' arguments for them."). The Court notes that it may be the case that Plaintiff's allegations do not fall within the "willful and malicious injury" exception. The Supreme Court, in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), explained that a medical provider's "intentional[]" and "knowing[]" rendering of "inadequate medical care" that fell below the standard of care for the plaintiff's condition did not meet the "willful and malicious" threshold. *Id.* at 61. As the Court explained, "[i]ntentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'" *Kawaauhau*, 523 U.S. at 61–62 (quoting Restatement (Second) of Torts § 8A, cmt. a (A.L.I. 1964)); *see also Ditto v. McCurdy*, 510 F.3d 1070, 1077 (9th Cir. 2007) ("The failure to obtain informed consent, without evidence of intent to injure, does not give rise to a willful and malicious injury within the meaning of § 523(a)(6)."); *In re*

*Campbell*, 676 B.R. 464, 482 (Bankr. S.D.N.Y. 2026) ("The word willful in (a)(6) modifies the word injury, indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Further, section 523(a)(6) encompasses intentional torts rather than negligent or reckless torts, and intentional torts generally require that the actor intend the *consequences* of an act, not simply the act itself." (quotation marks and citation omitted) (emphasis in original)). But it appears that this question is not properly before *this* Court, as "bankruptcy courts have exclusive jurisdiction over questions of dischargeability arising under §§ 523(a)(2)(A) and (a)(6)." *Chapin Home for the Aging v. McKimm*, No. 11-CV-667, 2015 WL 1237830, at *1 (E.D.N.Y. Mar. 17, 2015). Indeed, this exact point has been raised in another action *against Wellpath* where, as here, Wellpath did not respond to an argument that the claims were not discharged due to "willful . . . conduct" and the court noted that "questions regarding dischargeability are within the exclusive jurisdiction of the bankruptcy court . . . ." *Gallman v. Phipps*, No. 25-CV-12, 2026 WL 607253, at *3 (E.D. Ky. Feb. 10, 2026), *report and recommendation adopted*, 2026 WL 598383 (E.D. Ky. Mar. 3, 2026). Accordingly, "[o]n the present record," insofar as it seeks dismissal based on the scope of the bankruptcy discharge order, "Wellpath's Motion[] to Dismiss [is] denied without prejudice." *Id.* at *4.

c. Opt-out

While the proof of claim and the issue of dischargeability appear dispositive of the issues raised by the discharge order, the Court's conclusion is further strengthened because it appears that, under applicable Fifth Circuit law, Plaintiff would not be considered to have discharged his claims against the individual Wellpath Defendants.

Plaintiff argues (without citation to any authority) that the law of the Fifth Circuit governs the question whether the release of claims in the bankruptcy proceeding applies to his claims asserted here. (Pl.'s Opp'n 26.) Although choice of law rules in bankruptcy proceedings "are more difficult to discern" than typical choice of law principles that apply when a federal court exercises its diversity jurisdiction, *In re Coudert Bros. LLP*, 673 F.3d 180, 187 (2d Cir. 2012), this conclusion appears correct, *see In re Johns-Manville Corp.*, No. 20-3693, 2022 WL 4487889 (2d Cir. Sept. 28, 2022) (applying Second Circuit precedent to analyze whether order of the Bankruptcy Court of the Southern District of New York properly enjoined claims in action brought in Louisiana due to earlier discharge). Accordingly, the Court analyzes the scope of the bankruptcy discharge under the law of the Fifth Circuit.

A party "litigating against [the party subject to the bankruptcy proceeding]" is a "known creditor[] constitutionally entitled to actual notice—and not publication notice—before their litigation claims c[an] be released under [a] [Bankruptcy] Plan." *In re Tehum Care Servs., Inc.*, 672 B.R. 108, 113 (Bankr. S.D. Tex. 2025) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313–15 (1950)); *see also In re Placid Oil Co.*, 753 F.3d 151, 154 (5th Cir. 2014). Accordingly, in at least some circumstances, a party is not bound where it never "receive[d] actual notice[]" sufficient to alert it to the release of its claims. *In re Tehum Care Servs., Inc.*, 672 B.R. at 113.

The Wellpath Defendants argue that "there is no question that Plaintiff was served with a copy of Defendants' Suggestion of Bankruptcy dated November 20, 2024 . . . ." (Wellpath Reply 7.) Accordingly, they reason, this notice of the pendency of the action was sufficient to

place Plaintiff on notice of the release such that he can be bound by the Discharge Order.[6] (*Id.*) In so doing, Defendants largely cite cases involving a party's receiving notice of the bankruptcy proceeding such that it should have asserted its claim against the debtor. (*See* Wellpath Reply 7–9 (citing, *e.g.*, *In re Barnes*, 326 B.R. 832 (Bankr. M.D. Ala. 2005)).)[7] While this logic might apply to the claims insofar as they are asserted against Wellpath (an argument Wellpath does not make), it does not suggest that notice that the party *was bankrupt* should somehow be treated as adequate notice of the release of *third-party* claims, such as those against the individual Wellpath Defendants. *See In re Spirit Airlines, Inc.*, 668 B.R. 689, 715 (Bankr. S.D.N.Y. 2025) (noting that, unlike courts within the Second Circuit, "the Fifth Circuit has never permitted the grant of

[6] Some courts have determined that this result is compelled as to the release of third-party claims by the Supreme Court's 2024 decision in *Harrington v. Purdue Pharma*, 603 U.S. 204 (2024). *See In re Smallhold, Inc.*, 665 B.R. 704, 716 (Bankr. D. Del. 2024) (holding that affirmative opt-out is required in the wake of *Purdue Pharma*); *see also* Lawrence Ponoroff, *Third-Party Releases in Chapter 11: A Phoenix Rising from the Ashes of Purdue Pharma*, 34 Am. Bankr. Inst. L. Rev. 71, 84–94 (2026) (describing various approaches of different district and bankruptcy courts to this question).

[7] Some of the citations are distinguishable on additional grounds. For instance, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950), held that notice pursuant to a New York Banking Law was incompatible with the requirements of the Fourteenth Amendment because notice of matters related to the trust could have been sent by mail to beneficiaries whose locations were known. *Id.* at 319–20. This is not inconsistent with the conclusion that Plaintiff needed notice mailed to his current address that his claims against the individual Defendants, who were not directly involved in the bankruptcy, might be discharged if he failed to object. And in *In re Gaffney*, No. 19-71492, 2020 WL 6066004, at *8 (Bankr. C.D. Ill. Sept. 29, 2020), the court expressly distinguished between notice requirements in Chapter 11 bankruptcy (*i.e.*, the category to which the Wellpath bankruptcy belongs) and the Chapter 7 bankruptcy it was considering.

For reasons already explained, the Court has already determined that Fifth Circuit law, rather than Second Circuit precedent, governs this issue, and so the Court is particularly unmoved by the Wellpath Defendants' citations to assertedly-determinative Second Circuit cases, such as *GAC Enters., Inc. v. Medaglia*, 52 F.3d 451, 456 (2d Cir. 1995), and bankruptcy court decisions interpreting Second Circuit caselaw, such as *In re Queen Elizabeth Realty Corp.*, No. 13-12335, 2017 WL 1102865 (Bankr. S.D.N.Y. Mar. 24, 2017), *aff'd*, 586 B.R. 95 (S.D.N.Y. 2018). (Wellpath Reply 8–9.) These cases shed no light on the applicable Fifth Circuit law.

nonconsensual third-party releases in bankruptcy cases"); *In re Tehum Care Servs., Inc.*, 672 B.R. at 113 n.28 (explaining that the court rejected the defendant's reliance on cases applying the principle that, once creditors know about the bankruptcy, they must take steps to protect their rights, on the basis that none of these cases involved consensual releases between third parties). And to the extent that Wellpath argues that Plaintiff was served the requisite notices, (Wellpath Reply 9), Wellpath ignores that the docket in this case makes clear that, by the time the Wellpath bankruptcy concluded, Plaintiff had already left the facility to which these materials were mailed, (*see* Not. of Change of Address (Dkt. No. 18)). In any event, it appears that there is, at a minimum, a dispute of fact as to whether Plaintiff received actual notice of the third-party release, and that such notice is required under Fifth Circuit precedent. So, insofar as the Wellpath Defendants argue that the Discharge Order applies to the individual Wellpath Defendants, this argument fails on a Motion to Dismiss pursuant to Rule 12(b)(6).

2. Deliberate Indifference Claim

The Wellpath Defendants move to dismiss on the additional ground that, in their view, the SAC does not state a deliberate indifference claim against the individual Wellpath Defendants. (Wellpath Mem. 12.) The individual County Defendants move to dismiss on the same basis. (County Mem. 4–10.) In his opposition, Plaintiff does not oppose the dismissal of the claims against Defendant Latimer or Defendant Spano; instead, he represents that he is no longer pursuing those claims. (Pl.'s Opp'n 16 n.3.) Accordingly, insofar as the SAC asserted deliberate indifference claims against those two Defendants, those claims are dismissed. The Court considers only whether the allegations in the SAC state a deliberate indifference claim against the individual Wellpath Defendants and Defendant Price.

Because Plaintiff was a pre-trial detainee at the time he was allegedly denied adequate medical care, Plaintiff's claim falls under "the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight[h] Amendment." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted). A pre-trial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Id.* (quotation marks omitted) (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)).

To state a claim for deliberate indifference to medical needs under the Due Process Clause of the Fourteenth Amendment at the Motion to Dismiss stage, a pre-trial detainee must allege facts that, if proven, would establish two elements: (1) that the "deprivation of medical care . . . [was] 'sufficiently serious,'" and (2) that the defendant "acted or failed to act with 'a sufficiently culpable state of mind.'" *Smith v. Outlaw*, No. 15-CV-9961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see also Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382 (S.D.N.Y. 2020) (same). "The first element is objective and requires allegations that suggest that the detainee was subject to conditions posing a substantial risk of serious harm." *Taranto v. Putnam Cnty.*, No. 21-CV-2455, 2023 WL 6318280, at *10 (S.D.N.Y. Sept. 28, 2023) (quotation marks omitted); *see also Hayes v. N.Y.C. Dep't of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996). In the context of a claim brought pursuant to the Fourteenth Amendment, the second element "imposes an objective standard," *Taranto*, 2023 WL 6318280, at *10, which asks whether a prison official "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. Courts routinely

have held, relying on Eighth Amendment caselaw, that "[t]he same standards apply to a claim of deliberate indifference to serious medical needs on the part of nonmedical prison personnel" as apply to medical personnel. *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at *13 (S.D.N.Y. Mar. 30, 2017) (quoting *Hodge v. Coughlin*, No. 92-CV-622, 1994 WL 519902, at *11 (S.D.N.Y. Sept. 22, 1994), *aff'd*, 52 F.3d 310 (2d Cir. 1995)).

a. Sufficiently Serious Deprivation

As to the first prong, the Court determines that—at least for the purposes of a Motion to Dismiss pursuant to Rule 12(b)(6)—Plaintiff has adequately alleged facts that support the objective prong of the deliberate indifference inquiry. Plaintiff has alleged, among other things, that he has "severe" opioid use disorder, (SAC ¶¶ 20, 57), a condition that can lead to fever and vomiting, excessive sweating, life-threatening dehydration and pneumonia, and depression and anxiety, (*id.* ¶ 37). Plaintiff claims he did experience intense symptoms, including "excruciating pain" all over his body that prevented him from walking, as well as dehydration, diarrhea, severe vomiting, lethargy, and blurred vision. (*Id.* ¶ 61.) The allegations of severe opioid use disorder, which can be life threatening, and intense symptoms are enough to allege the existence of a serious medical need on a Motion to Dismiss pursuant to Rule 12(b)(6). *Sloley v. Joyce*, No. 23-CV-1469, 2025 WL 1032778, at *3 (N.D.N.Y. Feb. 5, 2025) (recommending that the court conclude that the plaintiff, who asserted that he had been receiving MAT and specifically suboxone to treat opioid use disorder, had adequately alleged serious medical need), *report and recommendation adopted*, 2025 WL 879932 (N.D.N.Y. Mar. 21, 2025); *Bull v. Howard*, No. 22-CV-766, 2024 WL 1939480, at *2–3, *11 (W.D.N.Y. Apr. 11, 2024) (recommending that the court conclude that the plaintiff, who was "addicted to opioids and methadone" and "need[ed] to detox" upon arrival at a detention facility had alleged "a sufficiently serious medical condition

for [the] purposes of the objective prong of a Fourteenth Amendment deprivation of medical care claim"), *report and recommendation adopted*, 2024 WL 1932696 (W.D.N.Y. May 2, 2024); *P.G. v. Jefferson County*, No. 21-CV-388, 2021 WL 4059409, at *5 (N.D.N.Y. Sept. 7, 2021) ("[The] [p]laintiff has established that opioid use disorder is a chronic brain disease and that opioid withdrawal has been recognized as an 'objectively' serious medical condition that, according to plaintiff's treating physician, must be treated with methadone."); *Alvarado v. Westchester County*, 22 F. Supp. 3d 208, 217 (S.D.N.Y. 2014) ("[S]ome courts have concluded that the failure to provide methadone to an inmate exhibiting symptoms of withdrawal may constitute deliberate indifference to a serious medical need by intentionally allowing the inmate to suffer from the effects of his withdrawal." (quotation marks omitted and alterations adopted)). They are further strengthened by Plaintiff's allegations that, prior to his being detained in the WCDOC facility in Valhalla, he had received a prescription for MOUD from his physician and was undergoing treatment. *See P.G.*, 2021 WL 4059409, at *4 (granting emergency relief in light of unrebutted testimony from the plaintiff's physician that the plaintiff had been receiving MAT prior to his detention); *Martirosyan v. Hakopyan*, No. 22-CV-1169, 2022 WL 3127836, at *3 (C.D. Cal. Mar. 15, 2022) ("While the lack of previous treatment does not necessarily mean that [the] [p]laintiff's need is not objectively serious, the fact that the *P.G.* plaintiff had a physician already determine the treatment was appropriate made it easy for the [*P.G.*] [p]laintiff to show his need for the treatment was objectively serious.").

b. Culpable State of Mind

As to the second prong, the Court concludes that Plaintiff's allegations, if proven, would support a Fourteenth Amendment claim. The Wellpath Defendants argue that Plaintiff's requests for treatment constitute a "mere disagreement over the proper treatment" which is insufficient to

"create a constitutional claim." (Wellpath Mem. 12 (quoting *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)).) But that is not what Plaintiff has alleged. Instead, Plaintiff's Second Amended Complaint advances the theory that Defendants gave him *no* medication that would constitute an adequate treatment for his Opioid Use Disorder, offering him only Tylenol, which "did nothing," a fact to which he repeatedly alerted the Wellpath Defendants in subsequent requests for treatment. (SAC ¶¶ 70–85.) He also alleges that he described symptoms to the individual Wellpath Defendants, (*id.*), including continuous vomiting, an inability to eat or drink, nausea, shaking, diarrhea, severe lethargy, and blurred vision, which, in some instances, had been ongoing for weeks, (*id.* ¶¶ 76–83). He has alleged that he was told by Defendant Onua that he would have to quit "cold turkey," (*id.* ¶ 72), although Onua observed track marks on his arms and observed an elevated blood pressure and pulse consistent with opiate withdrawal, (*id.* ¶ 71). Virtually identical allegations have been held to satisfy the second prong of the Fourteenth Amendment analysis. *See, e.g.*, *Alvarado*, 22 F. Supp. 3d at 217 (holding that both prongs were satisfied where the defendants denied any treatment with methadone or Suboxone, and despite the plaintiffs' repeated requests for medical attention and complaints of insomnia and loss of appetite, the plaintiffs received "over-the-counter medications" that were "not effective," and one of the plaintiffs had months-long vomiting spells and interruption of sleep).

Moreover, Plaintiff alleged that he made each of the individual Wellpath Defendants aware of these issues, but that they did not meaningfully respond or provide medication that would constitute adequate treatment, conforming instead to WCDOC's policy of refusing to provide MAT to non-pregnant individuals. (*See* SAC ¶¶ 70–85, 92.)[8] These allegations also

---

[8] Defendants argue that Plaintiff's claim fails on the grounds that "Plaintiff does not specify what symptoms he reported during these encounters, the medications he requested, the

support the second prong of the analysis. *See Ortiz v. Dinello*, No. 23-CV-3547, 2024 WL 3638342, at *9 (S.D.N.Y. Aug. 1, 2024) (concluding that allegations that a defendant was aware of the pain that the plaintiff was suffering, but nevertheless failed to provide the plaintiff with effective treatment, supported the conclusion that the defendant knew of and disregarded an excessive risk that the "[p]laintiff would suffer prolonged, exacerbated, and unnecessary pain without effective medications"). Where some treatment is given as a result of a provider "consciously choos[ing] an easier and less efficacious treatment plan," including where "treatment recommendations are not derived from sound medical judgment[] but rather from ulterior motives," the chosen course of treatment may constitute actionable indifference rather than a mere difference in opinion. *Gutierrez v. Ruiz*, No. 22-CV-1058, 2022 WL 17585968, at *5 (D. Conn. Dec. 12, 2022) (quotation marks omitted).[9] Accordingly, the Court concludes that

---

stated reasons for the denials, or who (whether the Individual Medical Defendant identified or someone else) was responsible for deciding the denials." (Wellpath Mem. 14.) But these are issues that should be decided on a properly developed factual record; it is enough that Plaintiff alleges here that he sought treatment for his symptoms and it was denied because he is entitled on a Motion to Dismiss to the reasonable inference that he adequately described those symptoms and that the treating medical professionals were the individuals responsible for granting or denying his requests for further treatment.

[9] The primary authorities relied on by the Wellpath Defendants and the County Defendants to argue that Plaintiff's claim constitutes a mere difference in opinion as to appropriate treatment are plainly distinguishable. In *McNamara v. Lantz*, No. 06-CV-93, 2008 WL 4277790, at *14 (D. Conn. Sept. 16, 2008), the court explained that the defendants provided Plaintiff with access to Vistaril and therefore distinguished the allegations from those where a plaintiff's "request for assistance with detoxification" was "ignored" and the plaintiff was "left . . . to withdraw 'cold turkey' alone in his cell," as effectively has been alleged here. Further, the Court notes that, at the time *McNamara* was decided in 2008, "[m]ethadone [wa]s still considered an experimental drug for licensing purposes, and a special license [was] required for each facility in which it [wa]s administered." *Id.* at *6. And finally, the Court in *McNamara* did not make its determinations until the factual record had been fully developed and was at the summary judgment stage. *See generally id.*

Similarly, in *Highley v. BAART Clinic*, No. 23-CV-569, 2024 WL 4487230, at *7 (D. Vt. July 22, 2024), *report and recommendation adopted sub nom. Highley v. Baart's Clinic*, 2024 WL 4224105 (D. Vt. Sept. 18, 2024), the court explained that the plaintiff's claim was premised

Plaintiff's allegations suffice to state a deliberate indifference claim against the Individual Wellpath Defendants on a Motion to Dismiss.

As to Defendant Price, however, Plaintiff's allegations do not state a viable deliberate indifference claim. As alleged in the SAC, it appears that Defendant Price saw Officer Smith forcing Plaintiff along. (*See* SAC ¶ 66.) Price then told Smith "to write up a disciplinary report against Plaintiff," saying "this isn't the Ramada, you don't pick your medication here." (*Id.* ¶ 67.) Defendant Price subjected Plaintiff to a disciplinary report, though it was dismissed. (*Id.* ¶ 68.)

"Plaintiff does not allege how" Defendant Price "knew that Plaintiff had" Opioid Use Disorder, "much less that it posed an excessive risk to his health or safety." *Walker v. DOCCS*, No. 23-CV-6598, 2024 WL 2304870, at *2 (W.D.N.Y. May 21, 2024). Indeed, the facts alleged in the SAC support, at most, the conclusion that Price would have been aware that Plaintiff stumbled and was not walking or standing normally, such that Smith was forcing him along. (SAC ¶¶ 66–67.) This is not an allegation that Defendant Price "was aware of Plaintiff's serious medical needs and . . . disregarded them." *Highley*, 2024 WL 4487230, at *7. And Plaintiff's being bent over and having a hard time walking is not enough to conclude that Defendant Price "should have known of the risk of serious harm to . . . [P]laintiff," particularly as there are no

on a request for a "dosage increase" of methadone by plaintiff to his doctor, who denied the request "after the completion of two EKGs and 'at least 10 pre-dose assessments.'" Accordingly, the plaintiff's own allegations established that he was receiving treatment that appeared well managed, that he had access to methadone, and, importantly, the plaintiff failed even to claim "that inadequate methadone levels [we]re related to the symptoms associated with" any of his identified conditions. *Id.* There is a meaningful difference between an argument that a plaintiff should receive a greater *dose* of an assertedly necessary medication and an argument that a plaintiff should receive *some* medication to continue his treatment at all.

other symptoms expressed to or visible to Defendant Price that, taken together, could put Defendant Price on notice of such a risk. *Peralta v. Khouri*, No. 24-CV-2760, 2025 WL 3022468, at *4–5 (S.D.N.Y. Oct. 29, 2025) (emphasis omitted); *see also Portillo v. Webb*, No. 16-CV-4731, 2017 WL 4570374, at *6–7 (S.D.N.Y. Oct. 11, 2017), *report and recommendation adopted*, 2018 WL 481889 (S.D.N.Y. Jan. 17, 2018) (recommending dismissal of claim based on the plaintiff's being "forced to walk" despite inability to do so after a stroke, based in part on failure to allege facts "from which a reasonable person could believe defendants knew or should have known that a substantial risk of serious harm existed" (quotation marks omitted)). Nor does Plaintiff allege any action by Defendant Price "that prevented him from receiving medical care in a timely fashion." *Walker*, 2024 WL 2304870, at *2. Accordingly, the SAC does not state a deliberate indifference claim against Defendant Price. *See Fredericks v. Does*, No. 21-CV-00553, 2021 WL 516928, at *3 (S.D.N.Y. Feb. 9, 2021) (granting motion to dismiss where "the complaint does not plead any facts showing that any individual knew or should have known that [the] [p]laintiff had a serious medical need and was deliberately indifferent to that need").[10]

3. *Monell* Claim

The Wellpath Defendants and the County Defendants claim that Plaintiff has not adequately alleged a *Monell* claim. The Court disagrees.

"Congress did not intend municipalities to be held liable [under § 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). "Thus, 'to prevail on a claim against a

---

[10] Nowhere in his SAC or his Opposition, which was prepared by counsel, does Plaintiff argue that he wishes to bring a claim against Defendant Price based on the false disciplinary report under a retaliation theory. (*See generally* SAC; Pl.'s Opp'n.)

municipality under [§] 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury.'" *Taranto*, 2023 WL 6318280, at *15 (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 36 (2d Cir. 2008)); *see also Fecteau v. City of Mount Vernon*, No. 23-CV-9173, 2025 WL 873018, at *7 (S.D.N.Y. Mar. 20, 2025) (same); *Williams v. Lohard*, No. 20-CV-10571, 2022 WL 269164, at *3 (S.D.N.Y. Jan. 28, 2022) ("[The] [p]laintiff's claim against the [c]ity fails for lack of facts supporting the existence of a municipal policy or practice." (citing cases)); *Palmer v. City of New York*, 564 F. Supp. 3d 221, 240 (E.D.N.Y. 2021) (dismissing claim against city where the plaintiffs failed to "sufficiently allege[] that they suffered constitutional violations as a result of an official policy or custom" (quotation marks omitted)).

"In determining municipal liability, it is necessary to conduct a separate inquiry into whether there exists a 'policy' or 'custom.'" *Kiss v. Torres*, No. 21-CV-10391, 2024 WL 1210941, at *20 (S.D.N.Y. Mar. 19, 2024) (quoting *Davis v. City of New York*, 228 F. Supp. 2d 327, 336 (S.D.N.Y. 2002), *aff'd*, 75 F. App'x 827 (2d Cir. 2003) (summary order)). Normally, "a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the [municipality]." *Newton v. City of New York*, 566 F. Supp. 2d 256, 271 (S.D.N.Y. 2008); *see also City of Okla. City v. Tuttle*, 471 U.S. 808, 823–24 (1985) (plurality opinion) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *Bird v. County of Westchester*, No. 20-CV-10076, 2022 WL 2263794, at *12 (S.D.N.Y. June 23, 2022) ("[The] [p]laintiff fails to allege the existence of any other similar

incident, which dooms [the p]laintiff's claim because a custom or policy cannot be shown by pointing to a single instance of unconstitutional conduct by a mere employee of the municipality." (citation and quotation marks omitted)).

A plaintiff may satisfy the "policy or custom" requirement by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Kiss*, 2024 WL 1210941, at *21 (citations omitted); *see also Patterson v. County of Oneida*, 375 F.3d 206, 226–27 (2d Cir. 2004) (describing methods of establishing *Monell* liability); *Atadzhanov v. City of New York*, No. 21-CV-5098, 2022 WL 4331304, at *11 (S.D.N.Y. Sept. 19, 2022) (citing same requirements). "Moreover, as noted, a plaintiff must also establish a causal link between the municipality's policy, custom, or practice and the alleged constitutional injury." *Fecteau*, 2025 WL 873018.

The County Defendants argue that Plaintiff has alleged that the County policy was to *provide* methadone maintenance during a "detoxification period" and that his claims are based upon a failure to follow this policy. (County Mem. 14.) But this is not what Plaintiff's SAC alleges: he claims that "Wellpath and[] . . . the County[] have a blanket policy of denying MAT to non-pregnant pre-trial inmates" and that the contract pursuant to which services were provided specified that methadone maintenance would be expressly disallowed after "the detoxification period," a term that was defined nowhere in the 2019 Agreement. (SAC ¶¶ 46–49.) A policy of denying methadone *after* a detoxification period does not support the conclusion that there was

also a policy of *providing* methadone during that period. Additionally, Plaintiff alleged that "blanket denial of MAT, whether on- or off-site, to non-pregnant inmates with [Opioid Use Disorder] detained by WCDOC is a practice that is so well-settled and consistently followed that it has the force of the law" and that other individuals at WCDOC were denied access to MAT. (*Id.* ¶¶ 53, 56.) Accordingly, Plaintiff has not alleged that Defendants departed from a County policy, but rather that they conformed their behavior to that policy.

Indeed, the foregoing recitation of Plaintiff's allegations demonstrates that he has alleged facts sufficient to support a *Monell* claim.

First, it is plausible that Plaintiff's allegations, if proven, demonstrate a formal policy officially endorsed by the municipality. "To satisfy the 'formal policy' route, the policy must be in the form of a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers.'" *Mumin v. City of New York*, 760 F. Supp. 3d 28, 60 (S.D.N.Y. 2024) (quoting *Monell*, 436 U.S. at 690). Plaintiff has alleged that the County has a "blanket policy" of MAT denial for non-pregnant pretrial inmates. (SAC ¶ 46.) Plaintiff has alleged that this policy is pursuant to the 2019 Agreement, which required Wellpath to submit a "plan to handle inmates requiring detoxification for alcohol or drug abuse" and further forbade the provision of "[m]ethadone maintenance . . . beyond the detoxification period" for those individuals who were not pregnant. (*Id.* ¶¶ 47–48.) Latimer and Spano are alleged to have been "directly involved in setting the scope and the terms of the 2019 Agreement," (*id.* ¶ 51), and when he was denied treatment, Plaintiff was advised by Defendant Onua that WCDOC did not offer methadone or suboxone for Opioid Use Disorder, meaning that Plaintiff would have to quit "cold turkey." (*Id.* ¶ 72). These allegations are consistent with the terms of the 2019 Agreement between Wellpath and the County expressly stating that the "detoxification" protocol established

by Wellpath would involve *no* MAT or prescription of MOUD, or any medication beyond over-the-counter treatments being used to address Opioid Use Disorder. And, for the reasons explained in Section II.B.2, *supra*, at least based on Plaintiff's allegations, this policy could violate the Fourteenth Amendment in circumstances like those alleged here.[11]

If the 2019 Agreement does not expressly provide that no MAT or MOUD will be used for pretrial detainees at WCDOC, then Plaintiff's allegations plausibly outline "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware" for the same reasons. Plaintiff was told in no uncertain terms that these treatments were not offered at the facility but that he would need to quit "cold turkey." (SAC ¶ 72.) Plaintiff alleges that other individuals at the County facility were also denied access to the treatments. (*Id.* ¶¶ 53, 56.) Accordingly, and counter to Defendants' arguments, Plaintiff has plausibly alleged more than a policy based on his own experience that he seeks to extrapolate to the entire jail population. (Wellpath Mem. 20 (quoting *Kirton v. Doe*, No. 20-CV-10860, 2023 WL 2586279 (S.D.N.Y. Mar. 21, 2023)); County Mem. 15 (quoting *Kirton*, 2023 WL 2586279).) Rather, Plaintiff expressly alleged both a policy of

---

[11] In reply, the Wellpath Defendants argue that Plaintiff's allegations are consistent only with his needing methadone maintenance during "the detoxification period," and accuse Plaintiff of inventing in his opposition memoranda a newfound "need for and lack of treatment beyond the detoxification period." (Wellpath Reply 6.) While, on a fully developed record, it might be possible to determine that Plaintiff was prescribed or had symptoms consistent with needing MAT only during a period of detoxification, Plaintiff's allegations are not inconsistent with his having been prescribed and needing MAT for long-term management of his Opioid Use Disorder. *See* John Howard et al., *Medication-Assisted Treatment for Opioid Use Disorder* 3, Nat'l Inst. For Occupational Safety and Health (May 2019) ("Length of [MAT] treatment is highly variable with all three MAT drugs and spans from months to years. Long-term treatment is often needed to prevent relapses."); *Hall v. Annucci*, No. 19-CV-5521, 2021 WL 4392526, at *1 n.2 (S.D.N.Y. Sept. 24, 2021) (taking judicial notice of medical information from official government sources). Accordingly, Plaintiff is entitled to that reasonable inference on a Motion to Dismiss pursuant to Rule 12(b)(6).

blanket denial and instances of other individuals in WCDOC custody being denied access to MAT. (SAC ¶¶ 53, 56.)

4. ADA Claim

The County Defendants move to dismiss Plaintiff's ADA Claim, arguing that his allegations do not state a viable claim for a violation of Title II of the ADA or Section 504 of the Rehabilitation Act. (County Mem. 16.) Again, the Court disagrees: the allegations in the SAC state a viable claim under the ADA and the Rehabilitation Act.

"Because the standards adopted by" the ADA and Section 504 "are nearly identical," courts "consider the merits of these claims together." *McElwee v. County of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). "To establish a prima facie case of discrimination under either the ADA or Section 504, a plaintiff must show the following: (1) plaintiff is a 'qualified individual with a disability;' (2) plaintiff was 'excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by the public entity;' and (3) 'such exclusion or discrimination was due to plaintiff's disability.'" *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (quoting *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009)) (alterations adopted). "The ADA defines 'disability' as a 'physical or mental impairment that substantially limits one or more major life activities,'" *id.* at 159, a "record of such an impairment," or "being regarded as having such an impairment," 42 U.S.C. § 12102(1). "Section 504 expressly incorporates, with certain qualifications not applicable here, the ADA's definition." *B.C.*, 837 F.3d at 159 (footnote omitted) (citing 29 U.S.C. § 705(20)(B)). Further, "[a] plaintiff may base [a] Title II [ADA] claim," and by extension a Rehabilitation Act claim, "on any of three theories of liability: disparate treatment (intentional discrimination), disparate impact, or failure to make a reasonable accommodation." *Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021).

Individuals diagnosed with opioid use disorder are considered "individual[s] with a disability" within the meaning of the two statutes. *See Landau v. Good Samaritan Hosp.*, No. 23-CV-7227, 2026 WL 880540, at *1 (S.D.N.Y. Mar. 31, 2026) ("At all relevant times, [the] [p]laintiff has had a record of a disability within the meaning of federal and state anti-discrimination laws—OUD[.]"); *Taylor v. Wexford Health Sources, Inc.*, 737 F. Supp. 3d 357, 376 (S.D.W. Va. 2024) ("There is no dispute that [the plaintiff] suffers from [Opioid Use Disorder] or that [Opioid Use Disorder] constitutes a disability."); *Miller v. Chester Cnty. Commissioners*, No. 23-CV-4192, 2024 WL 3606334, at *7 (E.D. Pa. July 31, 2024) (holding that allegations that the plaintiff "suffers from opioid use disorder" were sufficient to support an ADA claim); *P.G.*, 2021 WL 4059409, at *4 ("[The] [p]laintiff counts as an 'individual with a disability' because he has been diagnosed with opioid use disorder and is participating in a supervised rehabilitation program."); *Pesce v. Coppinger*, 355 F. Supp. 3d 35, 45 (D. Mass. 2018) ("The parties do not dispute that [the plaintiff], who suffers from opioid use disorder, is a 'qualified individual with disabilities' under the ADA." (alteration adopted)).[12]

To the extent that the County Defendants attempt to rely on *Sternkopf v. White Plains Hospital*, No. 14-CV-4076, 2015 WL 5692183 (S.D.N.Y. Sept. 25, 2015), to conclude that

---

[12] Insofar as the County Defendants argue that Plaintiff is not "disabled" within the meaning of the ADA and the Rehabilitation Act because allegations as to Plaintiff's last time having used drugs are not included in the SAC (*see generally* SAC), "[t]he question . . . whether drug use is effectively ongoing or a serious problem is a fact-bound inquiry . . . requiring details of [an individual's] treatment and drug history" typically "best left [for] analysis at a later stage in the proceeding." *Schiavone v. Luzerne County*, No. 21-CV-01686, 2022 WL 3142615, at *8 (M.D. Pa. Aug. 5, 2022). *See also Teahan v. Metro-N. Commuter R. Co.*, 951 F.2d 511, 520 (2d Cir. 1991) (holding, in analogous context of determining whether employee was a "current substance abuser" for purposes of the Rehabilitation Act, that the employee's "status as a current substance abuser as of [the date in question] is a question of fact that requires resolution on remand").

Plaintiff has not adequately alleged he is "disabled," the comparison is unpersuasive. In that case, the court rejected the argument that the plaintiff had alleged a disability on the grounds that "the scant facts in the [operative complaint] do not allege that [the] [p]laintiff was ever addicted [to substances], and [the] [p]laintiff therefore fails to plausibly allege that his substance abuse is an ADA-covered disability." *Id.* at *6. By contrast, here, Plaintiff alleges that he "has struggled with opioid addiction for 15 years," a fact suggestive of disability within the meaning of the ADA and the Rehabilitation Act. (SAC ¶ 57.) Further, Plaintiff has at a minimum alleged that, without treatment, he is substantially limited in the major life activity of sleeping, and his allegations may also support substantial limitations on the major life activities of eating and drinking, and/or cleaning or grooming himself. (*See id.* ¶¶ 61, 73, 75 (alleging that Plaintiff was "too weak to make it to the shower for over a week," was "not able to sleep," "lost control of his bowels on at least [two] occasions, necessitating a change of clothes," experienced an "inability to eat or drink," and on multiple occasions "was physically unable to take his medication" due to "tremors" that prevented him from "hold[ing] [a] cup of water").) Sleep is "undoubtedly a major life activity." *Felix v. Bloomberg, L.P.*, No. 24-CV-960, 2026 WL 819071, at *5 (S.D.N.Y. Mar. 24, 2026), *reconsideration denied*, 2026 WL 1453575 (S.D.N.Y. May 22, 2026). While Plaintiff's allegations would benefit from additional development as to the duration and extent of the limitations he experienced, the Court is also mindful of the procedural posture of this case, and the weight of authority holding that both Opioid Use Disorder and "[d]rug addiction qualif[y] as a disability under the ADA" and Rehabilitation Act, *Schlosser v. Elzea*, No. 19-CV-1380, 2020 WL 887752, at *4 n.10 (D. Conn. Feb. 24, 2020). *See also Stinnett v. Delta Air Lines, Inc.*, 278 F. Supp. 3d 599, 612 n.3 (E.D.N.Y. 2017) ("[T]his [c]ourt has found that drug addiction is a disability protected by the ADA."). Accordingly, drawing all reasonable

inferences in favor of Plaintiff, the Court concludes that Plaintiff has alleged that, without treatment, he is "not able to sleep," in a way that impacts the major life activity of sleeping. (SAC ¶ 73.) *See also Adams v. Delaware County*, No. 23-CV-1178, 2024 WL 4349950, at *6 (E.D. Pa. Sept. 30, 2024) (crediting allegations that denial of suboxone, which led incarcerated person to be unable "to exercise, read, and eat," sufficed to state an ADA claim).

As to the second element, it is uncontested that Plaintiff "sufficiently alleges that the" WCDOC facility "where he has been held [is a] public entit[y] subject to the ADA" and the Rehabilitation Act. *McFadden v. Noeth*, 827 F. App'x 20, 28 (2d Cir. 2020) (summary order); *see also Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016). The County Defendants argue in passing that Plaintiff "has not alleged anywhere in his Complaint that he was excluded from participation in, or being denied the benefits of some service, program, or activity." (County Mem. 17.) Not so—the denial of medical treatment constitutes the denial of a "service" or a "benefit" within the meaning of the ADA. *See Miller*, 2024 WL 3606334, at *7 (allegations that the plaintiff was "deprived . . . of access to medical services" constituted the denial of the "benefit of a health service"). This conclusion is also supported by binding Second Circuit precedent and persuasive Supreme Court dicta. *United States v. Georgia*, 546 U.S. 151, 157 (2006) ("[I]t is quite plausible that the alleged deliberate refusal of prison officials to accommodate [the plaintiff's] disability-related needs in such fundamentals as mobility, hygiene, [and] medical care[] . . . constituted 'exclu[sion] from participation in or . . . deni[al of] the benefits of' the prison's 'services, programs, or activities.'"); *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998) ("Modern prisons provide inmates with many recreational 'activities,' medical 'services,' and educational and vocational 'programs,' all of which at least theoretically 'benefit' the prisoners (and any of which disabled prisoners could be 'excluded

from participation in').''); *Tardif v. City of New York*, 991 F.3d 394, 404 (2d Cir. 2021) ("[I]t is clear that access to custodial medical services available throughout an arrestee's pre-arraignment detention constitutes 'services, programs, or activities' of the City." (footnote omitted)). Accordingly, these elements are satisfied for the purposes of the instant Motion.

Finally, it appears that Plaintiff's allegations adequately support the conclusion that Plaintiff has alleged he was excluded from a "service" (medical treatment) due to his Opioid Use Disorder. Although authority from within the Second Circuit is scarce, courts confronting similar facts—such as the "deni[al] [of a plaintiff's] previously prescribed Suboxone dosage in favor of a lesser amount" before an ultimate "deni[al] [of] Suboxone or other MOUD completely" and a "refus[al] to provide [a plaintiff] with medication to aid his withdrawal"—hold that these allegations "sufficiently plead[] discrimination by reason of disability." *Adams*, 2024 WL 4349950, at *6. Indeed, courts confronted with a blanket policy of denying "methadone treatment . . . to all non-pregnant inmates, disabled or otherwise," have nevertheless declined to dismiss ADA claims by individuals with [Opioid Use Disorder] based on those policies, as "the methadone policy may prevent people with [Opioid Use Disorder], such as [the plaintiff], from receiving adequate medical care." *Strickland v. Delaware County*, No. CV 21-4141, 2022 WL 1157485, at *3 (E.D. Pa. Apr. 19, 2022). The policy/custom here, which is alleged to have denied access to MAT entirely, not just a specific drug, is even more plausibly discriminatory. *See Landau*, 2026 WL 880540, at *7 (S.D.N.Y. Mar. 31, 2026) ("[The] [p]laintiff[,] [who was alleged to suffer from Opioid Use Disorder,] further alleges he was denied a PICC line pursuant to the Hospital's policy of denying PICC lines to patients with a history of drug abuse. Several courts have held that such blanket treatment bans are likely discriminatory." (citation omitted)); *Taylor v. Wexford Health Sources, Inc.*, 737 F. Supp. 3d 357, 376 (S.D.W.

Va. 2024) (treating as probative of discrimination the fact that a nurse told the plaintiff "she would not give him Suboxone in her jail, regardless of his treatment by outside providers" and evidence that "pregnant patients with [Opioid Use Disorder] were treated differently to ensure that they did not suffer withdrawal," facts remarkably similar to those alleged here, (*see* SAC ¶ 76)); *Smith v. Aroostook County*, 376 F. Supp. 3d 146, 159–60 (D. Me. 2019) ("The Defendants' out-of-hand, unjustified denial of the [p]laintiff's request for her prescribed, necessary medication—and the general practice that precipitated that denial—is so unreasonable as to raise an inference that the Defendants denied the Plaintiff's request because of her disability.").

At a minimum, Plaintiff has alleged that his disability has not been accommodated. He alleges that he received only Tylenol as treatment for his Opioid Use Disorder, and that it was not effective. (SAC ¶¶ 70–85.) *P.G.*, 2021 WL 4059409, at *4 ("In opposition, [the] defendants contend that [the plaintiff] might be given other medications that might alleviate his withdrawal symptoms. However, a reasonable accommodation must be effective." (citing *Wright*, 831 F.3d at 72)). In response, the County Defendants rely on Plaintiff's prior pleadings to argue that Plaintiff received certain medications "to assist with his withdrawal symptoms," and argue that "[s]imply because medical providers at the Jail did not prescribe Plaintiff his preferred withdrawal medications" does not support the conclusion that an ADA violation occurred, (County Mem. 18), relying on *Tardif*, 991 F.3d at 405. But even cases embracing this conclusion, and specifically *Tardif*, the Second Circuit case from which it stems, note that allegations that a facility "systematically delays or denies pre-arraignment detainees reasonable medical services for their disabilities" may be distinguishable from a disagreement as to appropriate treatment. *Id.* at 407. *See also Greene v. City of New York*, 725 F. Supp. 3d 400,

425 (S.D.N.Y. 2024) (explaining that the operative distinction is whether the plaintiff "challenges the adequacy of services rather than the denial of services provided to non-disabled individuals"). Plaintiff's claim is distinguishable, however, because he alleges systematic denials of effective medical treatment due to a blanket policy/custom of refusing to treat Opioid Use Disorder with effective medications, which arguably is a "consideration[] that w[as] 'unrelated to' or 'improper to consideration of'" the services in question. *McGugan v. Aldana-Bernier*, 752 F.3d 224, 234 (2d Cir. 2014). *See also Costin v. Glens Falls Hosp.*, 103 F.4th 946, 955 (2d Cir. 2024) (holding that a defendant hospital's "blanket policy that subjects a disabled individual to different medical testing or treatment based on that individual's disability" where it was possible to infer that the policy was adopted "based on a pejorative view" of the individuals with that disability "rather than based on any medical rationale" was actionable); *Landau*, 2026 WL 880540, at *7 ("[T]he policy bars all patients with a history of drug use from receiving home-based intravenous antibiotic treatment via a PICC line simply because they abused drugs in their past. Essentially, the policy assumes all patients with a history of drug use will use their PICC line to inject themselves with drugs [and is therefore actionable]."); *contra Giggetts v. County of Suffolk*, No. 19-CV-4885, 2022 WL 1046311, at *4 (E.D.N.Y. Apr. 7, 2022) (explaining that, under *Tardif*, an unexplained failure to provide medication, coupled with an awareness of the plaintiff's disability, nevertheless did not constitute withholding of medication "because of" the disability, where there was no allegation that this unexplained decision "was motivated by considerations that are unrelated to proper medical decision-making" (quotation marks omitted)). While it might be the case that, with the benefit of a fully developed record, Defendants can point to prescriptions—which again, are not alleged in the SAC—that are "effective" treatment for Plaintiff's Opioid Use Disorder, and therefore argue that there was no

systematic denial of reasonable medical services, "eff[icacy] is a fact-specific question," not properly resolved on a Motion to Dismiss pursuant to Rule 12(b)(6). *P.G.*, 2021 WL 4059409, at *4.

## III. Conclusion

For the reasons set forth above, the Wellpath Defendants' Motion to Dismiss is denied and the County Defendants' Motion to Dismiss is granted in part and denied in part. As this is the first adjudication of Plaintiff's claims on the merits, the dismissal is without prejudice. *E.g.*, *Alameda v. Ass'n of Soc. Work Boards*, No. 23-CV-6156, 2024 WL 4302389, at *6 (S.D.N.Y. Sept. 25, 2024) (dismissing claims in counseled case without prejudice given that it was the first adjudication of those claims on the merits and the deficiencies identified by the Court appeared curable by pleading additional facts). The Clerk of the Court is respectfully directed to terminate the pending Motions at Dkt. No. 109 and Dkt. No. 110.

SO ORDERED.

Dated: September 30, 2026
White Plains, New York

KENNETH M. KARAS
United States District Judge